

This memo is written to attach to my 2007 Performance Appraisal. I have given a copy to Eric Taira, Vice President & Assistant General Counsel for the PL Group in the Legal Services Department, and I requested that he sign it after reviewing it. I have requested that it be attached to my 2007 Appraisal.

The purpose of this memo is to obtain a more constructive Appraisal and to explain the background of the 2007 Appraisal. Some of the criticisms in the 2007 Appraisal were made in 2006. I specifically addressed those 2006 criticisms over the course of 2006 and supplied Eric Taira with a memo setting forth facts showing substantial improvement. However, those facts were ignored in the 2007 Appraisal.

I have set forth Eric Taira's comments in Sections I – VI of the 2007 Appraisal in bold print, and my views following the bold in each section. I believe Eric Taira's criticisms below are retaliatory in nature because (a) I have been critical and outspoken about Toyota's position on E-Discovery issues, (b) I have insisted that TMC follow the law and Eric Taira thinks I have been to insistent, (c) I have informed Eric Taira that I will have to go to upper level management if the situation does not change, and (d) I informed Eric Taira last year in my Self Assessment that the PL Group has become a dysfunctional work situation. The issue of retaliation will be discussed below in Section VII.

## I.    Teamwork and Communication.

**"Mr. Biller is encouraged to promote teamwork and communication with his fellow associates, our Japan staff, our outside counsel and TMC staff by seeking all opinions/perspectives of others, with a view towards reaching consensus decisions."**

### A.    Communication.

This criticism is unjustified and has no basis in reality. First, there are not any specific examples to substantiate this statement.

Second, there is not another associate in the PL Group who communicated more than me on legal issues in an effort to keep everybody informed and to make intelligent decisions based on the facts and the law. I was able to get consensus on how 21 cases should be resolved in the calendar year 2006 and three of those cases went to trial. In other words, there are 21 specific situations in which I was able to communicate with TMC and get consensus on how to resolve cases.

Third, I spent countless hours communicating with fellow associates, outside counsel, TMC and the Japan Staff in an effort to establish "consensus" on important legal issues. I constantly communicated via e-mail with outside counsel, TMC staff, Japan Staff, and fellow associates to keep everybody informed on relevant and important issues. I drafted exhaustive memos related to PL Group meetings, video-conferences with TMC, meetings with associates at TMA-DC and TEMA, outside seminars, trial reports, and any significant matter. I have prepared power point presentations for outside counsel and TMC in an effort to get consensus. This communication was done for the specific

1

purpose of informing all interested parties of relevant issues related to decisions that needed to be made (i.e., consensus) and to improve the legal position of Toyota. For example:

1. I made an in person power point presentation at Hartline Dacus on June 20, 2006 to explain how that firm was not properly representing Toyota and explaining how to improve that representation;

2. I prepared numerous memos to attorneys at Hartline Dacus to teach them how to properly prepare cases for resolution and to educate those attorneys on the "processes" that must be followed;

3. I visited Hartline Dacus on a second occasion to discuss poor performance issues and to teach attorneys how to properly evaluate cases.

4. I drafted a comprehensive Engagement Letter setting forth Toyota's reasonable expectations of its outside counsel to improve that representation and to reduce legal expenses and settlement figures;

5. I prepared the Credible Trial Threat power point presentation at the Outside Counsel Seminar outlining the cornerstone of Toyota's litigation management philosophy;

6. I prepared numerous memos and e-mails to Eric Taira, all Managing Counsel, Japan Staff and TMC related to E-Discovery issues to inform all interested parties of those issues and to protect Toyota;

7. I prepared memos following discovery and investigations related to E-Discovery investigations at TMA-DC and TEMA to keep all interested parties informed;

8. I prepared presentations for the E-Discovery Submit to give all interested parties the benefit of discovery and investigations conducted related to E-Discovery;

9. I prepared memos on adopted processes and procedures related to E-Discovery so all Managing Counsel knew those processes and procedures (process of issuing Notices for Litigation Hold & Process of conducting searches, collections and review of electronically stored information ("ESI");

10. I have sought the timely advise of outside counsel on numerous legal issues to provide TMC, the Japan Staff and all Managing Counsel/Eric Taira with the benefit of the law before discussions are made: (a) Joe Valentine's memo on searching, collecting, reviewing and producing ESI; (b) Bowman & Brooke's opinion letter on when to issue a Notice for Litigation Hold for the 4th generation 4Runner; (c) Joe Valentine's opinion letter related to the non-discoverability of the data base used to review the ESI collected from TMA-DC: (d) numerous memos from Bowman & Brooke related to obtaining the most restrictive Non-

Sharing Protective Order and obtaining copyright protection over the "Books of Knowledge" and TRIM; (e) memos regarding the discoverability of ESI recently discovered;

11. I routinely provide TMC with the most complete Case Summary Reports and Executive Summaries at least 45 days before mediations and trials to reach consensus on how cases should be resolved.

I have assembled all of these communications to substantiate the high level of my communication. Those notebooks of written communication are available.

I have also regularly communicated with all interested parties in person during National Rollover meetings, conferences with TMC and the Japan Staff related to E-Discovery issues at TEMA and TMA-DC, and at TMS. I conducted Engineering Evaluation Conferences with outside counsel and Toyota's experts to monitor the development of cases. I actively participate in meetings on Litigation Testing and I was the person responsible for forming the 6 sections in Litigation Testing Proposals that need to be analyzed for any test (Test, Purpose, Risks, Costs, Point to be proven, and Changes the Risks will Materialize).

Furthermore, Eric Taira has meetings related to my relationship outside counsel because a I am very tenacious and critical of their work performance and representation of outside counsel. Many of the lawyers I supervise were hired by Eric Taira and he is much more loyal to them than me. I don't have any such conflict of interests, so I'm very upfront with my criticisms and I have very high expectations on how cases are evaluated and prepared. Eric Taira has never told me anything about his communications with outside counsel, but they have informed be about some of their discussions. It is simply unfair for Eric Taira to "judge" me on communication with outside counsel without giving me a fair opportunity to discuss the issues with him and to give him my point of view. I told Eric Taria last year:

## "E. Due Process.

I have been advised that certain outside counsel are allegedly "afraid" that I may not use their services and I have been unreasonably demanding. However, when I was informed of these "vague" and "ambiguous" accusations, I was not told of the specific nature of the complaints, the circumstances in which outside counsel became "afraid" and I was led to believe that Karl Viehman and Kurt Kern are two of the outside counsel making these statements. It is simply unfair to approach me with vague/ambiguous accusations without giving me "fair notice" and an "opportunity" to address the concerns by putting everything in the proper contexts. When I talked to Karl Viehman and Kurt Kern about my management style, they both told me that they were not offended in any manner about how I approach them and the management of cases they work on with me. Karl Viehman stated that he took my criticisms of his work "personally" the first couple of times, but then realized my criticisms were not "personal" but designed to protect the interests of Toyota. Kurt Kern specifically told me that he does not have any criticisms of my

3

management style and the results speak for themselves. I have asked both Karl Viehman and Kurt Kern to tell me how I can be a better managing counsel and they both told me that I should not change because my approach is working. They both told me that they would tell me if they had any criticism or if they were offended, but they did not and have not. If criticisms are going to be launched from outside counsel through in-house management, then I should be given "notice" by being told (a) who is making the criticisms, (b) the facts/circumstances of the underlying incident that caused outside counsel to launch the criticism, (c) what outside counsel has specifically said, (d) the response to outside counsel's comments, and (e) an opportunity to address both the criticisms and the underlying incident before there is the formulation of any judgment on my management.

Clearly, my criticisms of Kurt Kern and Karl Viehman arose in the contexts of specific cases that they improperly handled and that either cost Toyota millions of dollars or potentially cost the company millions of dollars. The Mower settlement of over $3 million resulted from poor case development and case evaluation by Karl Viehman and Hartline Dacus; the Cantu case was improperly prepared and could have resulted in a settlement of $2.5 to $3 million, but was resolved for $1 million when I insisted on the development of new evidence; Espinosa was improperly prepared and resulted in an excessive settlement; Soto was neglected until I had to discharge the incompetent associate on the case, then we settled it for $250,000; Garza/Sturm was improperly prepared until I asked Kurt Kern to get Pryce Tucker off the case because of his inadequate work performance, then the case was properly prepared to get a defense verdict. I voice my criticisms, and praise, under the appropriate circumstance to fully protect the interests of Toyota. If I'm going to be criticize for this approach, then those criticisms should be specific and not built on a house of hearsay cards because my reputation and career are at stake.

## A. Jim Halbrooks.

I specifically stated last year that Jim Halbrooks was going to harm my reputation with experts and/or other outside counsel in an effort to promote his own personal interests and/or to protect himself because I was critical of his work performance. Jim Halbrooks wanted to somehow make himself indispensable by means other than his work performance. Jim Halbrooks' May 4, 2005 e-mail to Doug Bishop regarding Don Tandy supports my conclusion and prediction. Jim Halbrooks wrote:

"I am sending this list to you. My counsel to you is to spend more time on items one and not item two. Don was close to dumping Toyota in Nov but we chatted and he hung in there. He is once again thinking about dumping Toyota because he feels he is being nationally defamed by your colleague. I counsel you to make it more, substantially more, of a peace conference and fence mending trip than a trip to prep him about Toyota Travel safe."

As confirmed by David Graves, Chris Spencer, Vince Galvin, Kurt Kern, Doug Bishop and Jim Halbrooks (through his silence) at the July 19, 2005 Rollover Quarterly Meeting,

4

Don Tandy has NEVER threatened to "dump" Toyota. I specifically asked everybody at that meeting if Don Tandy has ever stated, suggested or implied that he was thinking about "dumping" Toyota. Everybody said "no." Jim Halbrooks did not say "yes" during that meeting. Instead, everybody stated that Don Tandy valued his relationship with Toyota and he wanted to make it better by improving his trial testifying skills and preparation efforts. Furthermore, Doug Bishop and Chris Spencer independently met with Don Tandy while I was attending the Kurylowicz trial in May 2005, Doug Bishop distributed a memo regarding that meeting and his memo did not confirm Jim Halbrooks' statement. I had a pleasant dinner with Don Tandy before the second day of his testimony in Ramos-Guajardo (March 2005) in which we exchanged a lot of thoughts and "bonded", but he never told me he was thinking about "dumping" Toyota or that I had "nationally defamed" him. By November 2004, I did not formulated any specific opinions about Don Tandy's skills as an expert on handling/stability issues because I never saw him testify on those topics, Don Tandy gave average accident reconstruction opinions in Perry (September 2004) and Bracho went to trial in very late November 2004/December 2004, so there was not any reason for Don Tandy to "dump" Toyota in November 2004. Jim Halbrooks' statement to Doug Bishop ("Don was close to dumping Toyota in Nov but we chatted and he hung in there. He is once again thinking about dumping Toyota because he feels he is being nationally defamed by your colleague.") is simply false and a down right lie purely designed to make it appear as if Jim Halbrooks plays a meaningful role in the Program. I have NEVER "nationally defamed" Don Tandy; he never thought about "dumping" Toyota – let alone "dumping" Toyota because of me.

An attorney's reputation is probably one of the most important legal and professional assets. Jim Halbrooks has been allowed to tarnish my reputation. In the process, he has exposed Toyota to harms way because I am a "representative" of Toyota. Yet, Jim Halbrooks was not confronted about his slanderous, libelous, and false representations (as far as I know); he has not been reprimanded; he has not been asked to take responsibility for his conduct, apologize and make amends. Furthermore, I was required not to say or do anything to defend my "reputation" as Jim Halbrooks continued to be invited to meetings that involved the exchange of sensitive and privileged information that could harm my reputation and the interests of Toyota, if Jim Halbrooks decided to repeat comments made at those confidential meetings out of context. It is simply impossible for me to understand the logic and reasoning behind the decision to allow Jim Halbrooks to attend the Rollover Meetings when sensitive information and ideas are being exchanged and Jim Halbrooks can not be trusted to (a) not repeat any sensitive information and (b) he has proven himself to be dishonest. Why should my speech be chilled during the Rollover meetings in fear of Jim Halbrooks? Why should the "morale" of Jim Halbrooks be placed over my morale? There is a logical disconnect between the justification of inviting Jim Halbrooks to the Rollover meetings (maintain and/or improve his work performance by not destroying his morale) and reality. Jim already knows he is not a meaningful member of the National Rollover Program; I have taken him off of very rollover case under my management. Jim Halbrooks is not the same attorney and he is suffering from severe personal and professional problems. Inviting Jim Halbrooks to the Rollover meetings will not improve his morale, and his work performance will not

improve even if his morale is improved through an invitation. The "justification" for inviting Jim Halbrooks to these meetings is pregnant with unreasonable and unrealistic assumptions.

There is a double standard at work. When Vince Galvin left a National Rollover Quarterly Meeting in August 2005, I was instructed to tell Vince Galvin that he should not leave any such meetings early and if he could not attend the full meeting, then he should not attend at all. However, when Jim Halbrooks decided to leave the December 2005 meeting early before it was completed, I was not instructed to talk to Jim Halbrooks and his conduct was simply overlooked. Did anybody talk to Jim?

Furthermore, TMS wants Managing Counsel to establish "co-counsel" philosophy of management with outside counsel that is built on "mutual trust", but this situation with Jim Halbrooks, how my views have been received, and the preference Jim Halbrooks gets over me (and other counsel) are not promoting "mutual trust"; instead, there is a destruction of "mutual trust."

Again, it is my strong recommendation and sincere request that Jim Halbrooks not be invited to any National Rollover meeting in 2006.

### B. Jim Halbrooks:

Additionally, I have serious concerns about outside counsel who have continuously performed poorly to jeopardize Toyota's interests and who engaged in certain behavior that may be interpreted as "ethical misconduct." Jim Halbrooks is a problem. I hoped talking to Jim would cause him to perform at a higher level, but it has not worked. Jim's conduct over the last year proves to me that he will not improve because he has serious personal and professional problems that need to be resolved. Unless he resolves those problems, his performance will continue to be poor.

Jim simply took advantage of his relationship with Toyota for his own personal desires. He invited himself and Robin Guise to the Texas Rollover Quarterly Meeting in December 2003 without my permission; he "required" Robin Guise to be his "personal" paralegal during the Kephart trial in Stockton, California for nearly four months even though David Graves told him to use a paralegal in the San Jose office; he instructed Robin Guise to do "busy work" on cases that was not necessary, was wasteful, was not authorized and simply allowed Robin Guise to bill unnecessary hours to Toyota cases (time on Narjano reviewing deposition transcripts); he engaged in unprofessional conduct during the Kephart trial with lead trial counsel when David Graves excused Robin Guise; he attempted to "cover-up" these acts by lying to me. Jim falsely told me that (a) I gave him permission to attend the Texas Rollover Quarterly Meeting with Robin Guise, (b) Bowman & Brooke did not have another paralegal in San Jose to attend the Kephart trial so Robin "had" to attend, (c) I told him he would be lead trial counsel in Narjano, so his paralegal had to get caught up to speed on the case, (d) he and David Graves got into an argument because David Graves excused Alan Dorris from the Kephart trial without talking to Jim and (e) Jim told me his poor performance is due to his "career" crisis

6

because he wants to be a "lead trial attorney" and not because Robin Guise left Bowman & Brooke after David Graves took her off the Toyota Team.

Jim has also performed poorly in representing Toyota. The National Rollover Program specifies his duties/responsibility. He has repeatedly failed to fulfill his obligations. I have talked to Jim repeatedly about his duties and his failures, but he has not improved. Jim and I had discussions in August 2004 while in Japan, September 2004 while in Dallas, Texas during the Perry trial, November 2004 in Torrance, California and December 2004 in Houston, Texas during the Bracho trial. Jim failed to submit properly prepared Case Summary Reports in a timely manner and to have cases prepared in sufficient time to submit complete Case Summary Reports (The CSRs in Hunsberger, Butterfield, Paz, Ramos-Guajardo, and Donne Miller submitted between October 2004 and December 2004 were deficient); Jim failed to have experts properly prepared for Legal Engineering Conferences; Jim did not have the Ramos-Guajardo LEC on his calendar and would have missed that LEC if I did not remind him of the LEC the day before the LEC; Jim did not make sure Lee Carr attended the Cantu LEC after I specifically instructed Jim one week before the LEC to talk to all the experts, I reminded Jim 5 days before the LEC to talk to all the experts and Jim was actually at Lee Carr Engineering for the two days immediately before the LEC but he failed to talk to Lee Carr and Lee Carr to not appear at the Cantu LEC; Jim did not adequately prepare Mr. Yonekawa on the recall issues in Hunsberger when I specifically requested him to cover those issues and the case involves a recalled 4Runner; Jim failed to prepare Don Tandy in the Bracho trial on accident reconstruction issues after I specifically instructed Jim to get Don prepared; Jim does not take responsibility for his failures and he almost always blames his mistakes on "circumstances." Luke Torres and Alicia McAndrews have experienced similar shortcomings with Jim.

This sort of behavior verges on legal malpractice. This behavior is a sign of a professional who has lost touch with reality and does not have the interests of his clients at heart. Jim is out of control. He has been out of control for a long time. He has put his personal interests ahead of his clients' interests for a long time. I'm in charge of "managing" Jim, but he is not responding. I'm concerned that I will be criticized for not changing Jim or getting him to stop committing acts that verge on malpractice. I'm concerned that the approach that TMS wants to pursue will put me in a bad position. I'm concerned that I will be criticized for not controlling Jim. I'm concerned that TMS will change its internal procedures and protocols because Jim has provided Toyota legal advice and Jim will attempt to change my reputation with other outside counsel/experts to protect his reputation and interests. I'm concerned about the approach TMS wants to pursue with Jim because (a) it will not work and (b) he will harm Toyota and/or me in the process. I simply have worked too hard in my professional career and during the past years at TMS to have someone like Jim Halbrooks harm my clients and/or me. Jim's poor performance simply makes my job more difficult. I have to do the things that Jim does not do.

Jim claims he wants to be a "lead trial" attorney and handle the day-to-day aspects of cases. He is dissatisfied with his role of "National Counsel" in the Rollover Program.

Jim simply does not have the skills to be a lead trial counsel because he lacks attention to detail on many levels. If Jim is dissatisfied with his role, he will not improve because he will not have any enthusiasm for this role. He will grow to resent his role. He will grow to resent those people he views as responsible for not giving him opportunities as lead trial counsel.

I understand Don Marshall has met with Jim to discuss his performance. As a result of that meeting, Jim approached me on February 16, 2005 to discuss his performance. Jim told me that it is "very important to me (Jim) that we (Jim and me) get alone because I respect you and I like you." Jim had difficulty articulating anything beyond this message because he was getting emotional. Jim is obviously suffering because his personal and professional worlds are in turmoil. I told Jim that he needed to take responsibility for his mistakes to (a) avoid mistakes in the future, (b) so we can find the consequences of his mistakes and (c) so everybody could move beyond the mistakes to focus on the bigger picture. I explain it is very important to me that people take responsibility for their mistakes and he simply has failed to do so. Instead, he comes up with stupid excuses that are insulting. He agreed, but tried to give excuses for his mistakes. I further told Jim that I wasn't necessarily upset about the mistakes he was making; instead, I was upset because he was not putting in 100% effort to avoid mistakes and to make sure Toyota's interests were fully protected. I explained that mistakes are going to happen, but as long as he was making 100% effort then we could deal with the mistakes. I simply can't accept mistakes that are made as a result of an effort that is less than 100%. I told Jim that I wanted us to get alone and to have a better working relationship, but he had to (a) put in 100% effort and (b) he had to take responsibility for his mistakes. The meeting was short and it was somewhat disappointing because Jim tried to feed me ridiculous excuses for some of his recent mistakes and he wasn't truthful about how those mistakes occurred. Jim still has a "propensity" to spin history to make Jim look good or not bad."

It is unfortunate, and it should be unacceptable, that Eric Taira will show more loyalty and "trust" in outside counsel than Managing Counsel. There is an inherent conflict of interests between outside counsel and Toyota; the more work outside counsel performs on cases, the more money outside counsel generates. I do not have that conflict of interests and my loyalty and interests are for Toyota and its associates – not outside counsel.

## B.    Teamwork.

The second aspect of the above criticism is an empty statement. Again, there are not any specific examples to substantiate this erroneous comment. In reality, I have worked hard to become more of a "team player" by allowing others to take control of situations like Eric Taira requested.

I have taken a "back seat" to everybody at the National Rollover meetings. Eric Taira wanted to control all those meetings and he was not interested in hearing any point of view that was inconsistent with his agenda. I only spoke up when proposals were being made that were in violation of the law or fraudulent in nature because the TMS Ethics

Policy, and my duties as a licensed attorney, prohibit me from supporting any such proposals.

For almost 2 years, I have remained silent at Eric Taira's request about TMC's failure to follow the law and properly conduct discovery investigations, and to properly produce ESI in response to E-Discovery; he repeatedly instructed me to "let TMC come along" and "take ownership" with regard to E-Discovery and "not to push TMC until TMC is ready to act." I displayed the patience of a Saint in the name of "Teamwork."

There have been some occasions when I refused to agree to certain courses of action because the action or inaction was in violation of the law. For example:

1. I insisted that TMC produce ESI collected in the <u>Green</u> litigation because not to do so would violate TMC's discovery obligations and I did not agree to bury the ESI;

2. I insisted that I be allowed to interview TEMA associates to gather facts necessary to obtain the most restrictive Non-Sharing Protective Order because (a) TMC, TMS and TEMA agreed, (b) Dan Fuchs requested the help, (c) TMS has historically conducted such investigations, (d) TMS is contractually and legally obligated to provide such assistance and legal counsel, (e) TMS owns its ultimate legal duty of care to TMC, not TMC Legal, and (f) TMS has the same legal obligations to TEMA and TMC, so TMC Legal does not have the authority to prohibit TMS from providing legal services to TEMA -- especially to prevent TMS from learning important facts.

3. I did not agree to TMC's "process" of when to issue Notices for Litigation Holds in every case because that would create gaps of ESI that would not be preserved and would be destroyed, and it was inconsistent with the "process" that was point in place 2 years ago, so TMC would be exposing itself to allegations that it destroyed evidence and possible sanctions.

### C. There is an Unhealthy Work Environment that Undermines Communication and Teamwork.

Eric Taira has created a work environment that is dysfunctional, subject to deception, and dominated by either insufficient communication or intentional miscommunication without even attempting to obtain consensus from Managing Counsel and Toyota's outside counsel. Eric Taira's idea of establishing consensus is agreeing to everything TMC wants to do, and not persuading TMC to take a different course of action that TMC is legally obligated to follow. Additionally, he simply attempted to impose his will based on agreements or understandings he has form with TMC outside the presence of Managing Counsel and without the advice of outside counsel. Below are specific examples substantiating these observations.

First, on November 30, 2006 he instructed members of the National Rollover Committee and TMS Managing Counsel for the first time that TMS and TMC would start issuing Notices for Litigation Hold for each case and limit the scope to case specific documents, issues, and vehicles. But he did not inform anybody that TMC requested this process because TMC wanted to find opportunities to discard ESI. Instead, he came up with an illegitimate reason for this new process that was totally inconsistent with the accepted protocol that was in effect for almost 2 years (to not confuse associates on what ESI needs to be preserved). Furthermore, he and TMC did not even obtain the legal advice of outside counsel regarding the negative impact this proposed scheme would have on Toyota in light of the ongoing practices – create evidence that Toyota discarded potentially relevant evidence.

Second, Eric Taira yelled and screamed at National Rollover Counsel, David Graves, (when he really was yelling and screaming at me in the same meeting) in the March 2007 Rollover meeting about counsel and I not "thinking through" the consequences of creating a data base with Summation to review ESI collected at TMA-DC. Eric Taira stated that the data base was now discoverable and we exposed Toyota to a bad situation. Eric Taira was simply out of line and unnecessarily attacked us because he thought he & TMC were not informed of how the review was going to take place. However, Joe Valentine prepared an opinion letter at my request in January 2007 that essentially gave us the legal opinion that a search engine and data base was appropriate to review ESI. I e-mailed that opinion letter to Eric Taira and TMC in January 2007 before there was any search and collection of ESI at TMA-DC in February 2007 and before the review process started in March 2007. Eric Taira simply did not read the letter or he forgot the opinions expressed in the letter.

Third, Eric Taira insisted that he was right about the Summation data base being "discoverable", but he would not explain the basis of that erroneous opinion, claimed he has read cases holding the data bases was discoverable, and insisted that I had created a data base that was discoverable. I was forced to get another opinion letter explaining that such a searchable data base was NOT discoverable and there was not a single case on the books that held such a data base to be discoverable.

Fourth, Eric Taira has destroyed my relationship with TMC by either sending my e-mails intended for his eyes only related to E-Discovery to TMC without my knowledge and without giving me an opportunity to present my ideas & criticisms to TMC. I have repeatedly requested that Eric Taira explain why he has undermined my relationship with TMC, but he refuses to discuss the issue. I have explained that his actions are inconsistent with the Toyota Way, and have interfered with my attorney-client relationship with TMC, but he refused to respond to my e-mails.

Fifth, Eric Taira holds separate meetings with the Japan Staff and TMC related to E-Discovery issues without seeking guidance, input and recommendations from Managing Counsel. He allegedly formed a TMS E-Discovery Team in 2005 or 2006 without asking me or any Managing Counsel how that team should help Managing Counsel with E-Discovery. He knew that I was recommending the formation of the E-Discovery Team

and I wanted to lead that team, but he intentionally did not inform me about its formation and did not seek my views on how it should be formed.

Sixth, Eric Taira has failed to inform Managing Counsel about significant evidence directly related to rollover litigation that Toyota must produce in litigation and that he failed to bring to the attention to Toyota's outside counsel in 2000 or 2001 (Yonekawa's power point presentation to NHTSA). He has allowed me to recommend and take to trial 6 4Runner rollover cases without this very relevant document being produced in litigation.

Seventh, although I have recommended that Brian Eyres be dismissed from the National Rollover Program, and no other Managing Counsel believes he provides any benefit and is not helpful, Eric Taira refuses to dismiss him from attending the meetings and Brian Eyres continues to charge Toyota $300 an hour to attend the meetings (including traveling to Los Angeles from Phoenix).

Eigth, Eric Taira unilaterally decided to settle the Green to avoid E-Discovery issues involving TEMA; when we sought authority from Dian Ogilvie to settle this case for $2 millions, he did not inform her about the real reasons for settling the case. I totally disagreed, but he disregarded my opinion.

Ninth, when TMC, TEMA/TTC, TMA-DC and TMS agreed at the E-Discovery Submit that I should interview witnesses at TEMA/TTC regarding the "Books of Knowledge", he unilaterally told me that interview could not go forward until Mr. Shibata of TMC agreed. When he agreed within a couple of days, Eric Taira then stated that it could not go forward until TMC, TMS and TEMA/TTC had an in person meeting at TEMA/TTC to discuss the interviews and to get an agreement for TEMA/TTC. When that meeting took place in February 2007, and an agreement was reached that I should conduct the interviews, TMC then informed me that TEMA/TTC should conduct the interviews, not me, and Eric Taira did not oppose TMC's instruction. Clearly, Eric Taira and TMC were working together outside my presence to prevent me from conducting interviews at TEMA/TTC. I learned in March 2007 from Ike Fukumoto that TMC did not want me to interview the witnesses because I learn too much everytime I visit TEMA/TTC. I was the person who discovered the "Books of Knowledge" at TTC in connection with the Sears litigation.

Tenth, Eric Taira unilaterally instructed me to settle the Sears case for an amount that was unreasonable to avoid producing ESI and the "Books of Knowledge" in that case. I totally disagreed, but he disregarded my opinion.

## II.    Leadership/Initiative.

**"He is encouraged to promote a work environment where all points of view are invited and considered."**

I don't understand how I have not encouraged "a work environment where all points of view are invited and considered." Again, there are not any specific examples supporting

11

this statement. All points of view were expressed on any and all legal issues that must be resolved. However, I did not agree to take any courses of action or inaction that would not follow the law, and I repeatedly encouraged Eric Taira and TMC to take certain course of action consistent with the law that Eric Taira and TMC did not want to take. The notebooks of memos and e-mail communication between me and Eric Taira/TMC over E-Discovery issues is proof of my efforts.

## III.  Strengths to Build On.

**"A challenge for Mr. Biller will be allocating his time commitments among his litigation responsibilities and management responsibilities. He is encouraged to continue delegating responsibility for attending mediations and settlement conferences in appropriate cases to John Rodricks, National Claims Manager, and Carole Hargrave, Claims Manager."**

This is the same "criticism" that Eric Taira made last year and this statement is completely irrelevant to the issue addressed in this section of the Performance Appraisal regarding "strengths to build on." Last year, Eric Taria wrote:

**"Strengths To Build On:** One way to balance that allocation of his time commitments is to continue delegating responsibility for attending mediations and settlement conferences in appropriate cases to John Rodricks, National Claims Manager, and Carole Hargrave, Claims Manager."

I told Eric Taira last year that his comments are not accurate and constructive. I explained last year:

**"I have assigned John Rodricks and Carole Hargrave to attend mediations in my presence. Carole Hargrave attended the mediation in Woods, and John Rodricks attended the mediation in Kim, and Paniguara,. I have sought the recommendations of outside counsel to determine if my personal appearance at mediations is required to get the cases settled or will maximize the chances the cases will be settled. I attend those mediations when outside counsel recommended my attendance.**

**The above criticism does not address my "strengths", according to what I learned at the Great Manager's Program. My "strengths" include: "activator", "analytical", "strategic", "achiever" and "learner." In order to build on my "strengths", I need to be put in a work environment that will apply these strengths, so they will continue to grow and get stronger. These are the strengths that the Great Manager's Program identified. I have distributed literature to my supervisors on how to manage somebody with these strengths**

**In terms of case management, I have sought specific action to build these strengths. I have prepared and distributed my personal "Mission Statement", and prepared and sent a comprehensive Engagement letter to outside counsel."**

12

88

The criticism above does not even address my strengths and Eric Taira refuses to acknowledge those strengths. I took the Great Manager's Program, on my own initiative and on the recommendation of Eric Taira. Furthermore, following the Great Manger's Program I had a meeting with Eric Taira to talk about my strengths and how we can work together to make me a more productive and efficient associate by giving me more assignments consistent with my strengths. Again, Eric Taira refused to talk to me about my strengths and wanted to focus on "non-strengths." But for Dian Ogilvie's efforts, I would not be in a position to apply my strengths.

## IV. Areas for Improvement.

"At the same time, form a company internal perspective, Mr. Biller is encouraged to consider his role as a manager of company resources, including outside counsel fees, experts' fees and other case expenses. He is encouraged to develop his understanding of the company's operations and business units beyond the context of litigation, as a balance must be achieved in obtaining excellent litigation results while at the same time, managing limited financial and staffing company resources at TMS, TMC and the Toyota North American companies."

### A. Managing Company Resources.

This is essentially the same criticism Eric Taira stated in 2006 related to "Areas for Improvement." However, the comments are not justified and ignore the specific action and steps that I have taken in 2006 to address these criticisms. Before my Performance Appraisal was completed for 2007, I informed Eric Taira the following:

"I have taken specific actions to better protect the company's resources. I have required outside counsel to calculate "reasonable settlement values" and "reasonable jury verdict ranges" with a specific formula that forces them to identify damages and all legal issues, and to explain the basis of their recommendations. This has forced outside counsel to take responsibility for seeking settlement authority and has proven to be a check resulting in lower settlements to protect the company's "financial interests." I attempt, and I am successful most of the time, to negotiate settlements will within my authority, or I do not seek authority above the minimum necessary to settle cases. I have limited my requests for corporate witnesses from TMC to 10 occasions and this has protected the company's "human resources." I have become very familiar with TMA and TTC through extensive investigations at those companies in Sears and Green. I have asked to get more involved in the e-discovery projects to become more familiar with the business operations of the various departments and groups at TMS. To some extent, I have done so by informing Group managers about the Notice for Litigation Hold in Witherow, participating in e-discovery training of the groups and departments receiving the Notice for Litigation Hold in that case, and interviewing many TTC associates at TTC in Gardena related to the Greenberg litigation. I have also voluntarily offered my time to assist other Managing Counsel with their work loads

13

when they have been called into trial and I was available at work to assist by covering corporate witness depositions and attending EECs. Although spending time away from home continues to jeopardize my personal life and family life, I have volunteered to attend trials for other Managing Counsel who have conflicts and can not attend trials for their own cases. This is a very big sacrifice because I spent 85 days away from home in 2006 (nearly 3 months and ¼ of the year).

I asked Dian Ogilvie to assign me to a committee that will expose me to TMS and its business operations, and that will allow me to use my 5 Signature Strength Themes. Dian nominated me to work on the em2 committee designed to improve TMS and dealership customer service. I am working on the em2 project in addition to my case management and e-discovery projects."

Furthermore, I am responsible for managing some of the most high exposure cases, I have taken cases to trial against "Repeat Offenders" to discourage them from filing more complaints against Toyota and I have taken more rollover cases to trial than anybody. I have done so to firmly establish the cornerstone of Toyota's litigation management philosophy ("Credible Trial Threat"). More resources are needed when cases go to trial because more time, money and human resources are needed for a longer period of time during the course of a case's life because the case does not settle.

Moreover, I have complained to Eric Taira that nobody in the Rollover Program is taking 4Runner cases to trial, so I have to manage my cases in such a way to get trial opportunities in an effort to maintain a strong "Credible Trial Threat" with the Plaintiffs' Bar. I informed Eric Taira in my 2006 Self Assessment:

## "D. A Failure to Get More Support for the Creation of a "Credible Trial Threat."

Although 2005 has been a very successful year in terms of creating a more "credible trial threat" in the rollover program and in Texas (the single biggest jurisdiction with the most cases), and the creation of a "credible trial threat" is one of the most important goals for our group, I do not think everybody involved in the Rollover Program has this vision clearly in mind. This situation is making it increasingly difficult for me to maintain the current level of our "credible trial threat" and promote that threat to higher levels. It has been almost two years since Kephart vs. Toyota started trial in February 2004, and all the 4Runner rollover cases that have gone to trial have been under my management. Others need to take 4Runner rollover cases to trial. Even if cases can be settled, others need to pick 4Runner rollover cases to try because I should not have to create, maintain and promote this very important "group" goal on my own. It has been damaging to my personal health and family. I have spent 75 days away from home attending trials and mediations in 2005. It takes a personal and professional effort to manage cases into trial to minimize risks/costs and maximize benefits. The personal and professional sacrifices are tremendous. If others would take 4Runner rollover cases to trial, there would not be such an urgent need for cases under my management to go to trial and Toyota/I could benefit from other cases going to trial.

Additionally, settlement of the Evans case during the trial in Victoria, Texas was not good for Toyota in general and management of cases in Texas in particular. If people believed that case should have been settled for an amount that was even in excess of outside counsel's "reasonable settlement value" opinion, then that settlement should have taken place before trial when the trial judge ordered a Mandatory Settlement Conference or soon after the jury research results in August 2005 (there was plenty of time to get rid of the case at that time) – not immediately before closing arguments during trial. That settlement is a bad precedent for Toyota in Texas and elsewhere. This is yet another example of everybody not having a global vision of one of our primary "group" missions ("credible trial threat"). Note: I should not be criticized for identifying Evans as a case to be transferred to Doug Bishop because (a) I was told to identify a number of my case to transfer because I was getting involved in the Greenberg litigation (although I disputed that need), (b) Doug Bishop participated in numerous corporate witness depositions in Evans when I was engaged in Kephart between February and May 2004, so he was very familiar with the case, (c) Don Marshall accepted my Sturm/Garza case and managed that case at trial in the "Valley", Texas, in August 2005, so it was not fair to give him another trial candidate the following month, and (d) I had numerous 4Runner rollover cases set for trial during the same period that Evans was set for trial in September 2005 (Cantu was set for August 16, 2005, Hunsberger was set for August 28, 2005, Uy was set for September 12, 2005, and Naranjo was set for September 17, 2005).

Furthermore, no action has been taken to learn from the Evans experience to promote the "group" goal of creating a "credible trial threat." Although I managed that case for almost two years, nobody asked me if the case should settle immediately before closing arguments. Clearly, there was a disconnect between my evaluation of $500,000 and the settlement of $2.4 million. Yet, nobody has approached me since the settlement to discuss this settlement, the reasons for the settlement and what should be done in the future to avoid this situation from happening. I can only conclude that somebody is defensive about this settlement and wants to put it behind him. Again, I find the avoidance of this topic interesting (and indicative of the miscommunication/no coordinated communication concern addressed above) because I communicated with everybody about Don Tandy following the Ramos-Guajardo trial (after obtaining a defense verdict), and there was a full blown investigation about Don Tandy with Chris Spencer/Doug Bishop (without informing me and getting my views before the meeting) visiting Don Tandy in Houston (improperly concluding that a "lack of trial preparation" was the cause of Don Tandy's trial performance, the unnecessary creation of "stock-board" test report documents for Don Tandy and an implicit – if not explicit – suggestion by Chris Spence and/or Doug Bishop that counsel (Kurt Kern, and/or me) failed to properly prepare Don Tandy), Kurt Kern/David Graves/Doug Bishop/Eric Taira and I having a private meeting about Don Tandy, and then having a full blown discussion at the May 2005 Quarterly Meeting about Don Tandy's trial preparation in the name of perfecting our approach to trial preparation and management of cases at trial. However, in the Evans situation, nothing has been done to discuss the failure modes in that case among Managing Counsel and outside counsel to promote our "credible trial threat" philosophy. The inconsistency between how we reacted in Ramos-Guajardo/Don Tandy

and Evans is almost hypocritical.  The silence on the Evans settlement is deafening and is creating a lot of silent blame.

It is my recommendation that Managing Counsel should be "encouraged" to take cases to trial.  If everybody would fulfill the group goal of taking two cases trial (10 cases between 5 Managing Counsel), then we would be better off."

If Eric Taira would encourage the other Managing Counsel to take 4Runner rollover cases to trial, or not give authority to settle cases above $250,000, then I would not have to take so many cases to trial, and I would be able to preserve the company's resources.

Additionally, there are some cases that can not be settled for a reasonable sum, and taking those cases to trial is much more economic and preserves more company resources.  For example, in 2006 I managed the <u>Barahona</u> litigation involving Mikal Watts (the most notorious and talented plaintiffs' trial attorney who hit Ford Motor Company for $200,000 in various trials during 2005), in one of the worst jurisdictions because the Trial Judge was biased towards the plaintiffs.  Plaintiffs demand before trial was $32 million and plaintiffs reduce their settlement demand at the end of trial to $31 million.  That case could not possibly settle for any sum under $12 to $15 million.  Toyota spent $5 million to defend the case through trial, and I work relentlessly to have the case properly prepared for trial.  Toyota obtained a defense verdict, and Toyota saved (not spent) $7 million to $10 millions.

## B. Learning about Business Operations.

Eric Taira has not given me any opportunities to work with other Toyota companies to learn the business units and company's operations.  I repeatedly requested additional work assignments, but he never made any.  I had to take the initiative to learn about the business units and company's operations through my investigations at TEMA, TTC, TMA-DC, and TMS related to E-Discovery issues.  Furthermore, up until very recently, he would not support my repeated request to conduct similar investigations at TMC, as we are legally obligated to do so in order to fulfill our ethical and legal responsibilities related to E-Discovery.

## V. Future Goals and Responsibilities.

Major goals for Mr. Biller include: "(3) developing relationships with outside counsel with a view toward fostering the Toyota 'co-counsel' ideal borne of mutual trust, joint decision-making and shared risk-taking; and (4) developing and integrating eDiscovery processes into traditional case management team discovery handling procedures together with Lyn Asse, our litigation Support Manager.

### A. Relationships with Outside Counsel.

16



The first criticism above is simply not well founded. I have informed Eric Taira that I addressed this same criticism last year when he made the same comment. I informed Eric Taira of the following:

"I have deepen my working relationship with Toyota's outside counsel by focusing on those attorneys who practice law consistent with the "Toyota Way", and minimize my energies with counsel who conduct themselves in ways that undermine the "Toyota Way." It is simply impossible to "deepen relationships with all (emphasis added) of our outside counsel" if "all" means every attorney representing Toyota. There are only 24 hours in a day, and not "all" of Toyota's attorneys deserve to have a substantial relationship with Toyota. As a result, I have put more and positive energy into those relationships that will help Toyota in its "long term litigation management success" by not wasting efforts with some attorneys who are not acting in Toyota's best interests and who are actually detrimental to Toyota. This has required me to cut the fat, and go with more lean, mean and talented attorneys. For example, I transferred all the cases assigned to Jim Halbrooks to Bard Borkon of Bowman and Brooke because (a) Jim Halbrooks has been dishonest, untrustworthy, has deteriorated as a quality lawyer, does not have a good working relationship with David Graves (the patriarch of Toyota's National Rollover Program), thinks of his personal interests ahead of Toyota's interests, and in violation of Toyota's Ethical principles, and (b) Bard Borkon has the talent, energy, dedication, devotion, skill, experience and ethical conduct to properly represent Toyota. The nature of the Quarterly Meetings and the amount of information that is being exchanged, and progress of program projects, with Bard Borkon's involvement and Jim Halbrook's elimination is unbelievable and speaks volumes about Bard's qualities versus Jim's qualities. Additionally, I have referred many matters to Kevin Curry, Larry Mann, Paul O'Neil, Vince Galvin, Paul Carver, Barry Toone, Raj Sivanathan, Jill Goldsmith, Mike Madakoro, Gregory Gilmer, Frank Hosfstetler, and others at Bowman & Brooke to spread the rollover work from David Graves and to "deepen" my relationships with Toyota's counsel. In 2004 and 2005, most of the rollover cases were assigned to David Graves and Jim Halbrooks, but now it is more evenly spread between many more Bowman & Brooke attorneys. Additionally, I have further cultivated my decade long relationship with Raj Sivanathan by seeking his advise on discovery issues, asking him to assist me with legal issues surrounding e-discovery, and seeking his advice on discovery areas that may assist Toyota in discovery matters. I have also had private meetings with Raj to make sure he is happy at Bowman & Brooke and I have continuously reminded David Graves of Raj's importance to Toyota. I seek the guidance and counsel of David Graves very frequently to help me deal with the performance issues with Toyota's counsel and to manage the rollover program. I have brought Joe Valentine in e-discovery matters to cover privileged issues in Green, and Campagna. Furthermore, I have transferred cases from Jose Luzarrage to David Stone at Hartline Dacus to get better performance and representation from Hartline Dacus. This has brought Brian Rawson into the Toyota Team at Hartline Dacus because he is the associate assigned to help David Stone. Hartline Dacus now

·    17

93

Case 2:09-cv-00292-TJW    Document 1-3    Filed 09/25/2009    Page 19 of 36
2009-07-22 12:37    DIMITRIOS  31045998979 >> 31039328059
Case 2:09-cv-05429-GHK-RZ    Document 1    Filed 07/24/2009    Page 94 of 117    P 18/23

has more talented, skilled, energetic, and professional attorneys on the Toyota Team
and Toyota is benefiting from these moves."

"I have worked very hard to further develop a closer relationship with outside
counsel to foster "mutual respect", "joint decision making" and "trust." I don't
think there is another Managing Counsel who has worked harder in this endeavor.
I seek to affirmatively praise outside counsel on their achievements by sending
letters and e-mails of thanks, letting outside counsel understand and know my
specific expectations through an exhaustive Engagement Letter and constant
communication, by responding to their e-mails and letters in a timely fashion to
"acknowledge" their communications and "recognize" their work, by taking the
time to review their work protect and giving both positive and negative feedback for
purposes of improvement with more positive communications than negative
feedback (believe it or not), and by being honest, forthright, straightforward, and
upfront with outside counsel. Additionally, I spent a substantial amount of time
preparing a power point presentation, and detailed materials for outside counsel,
that I presented to Hartline Dacus on June 20, 2006 in an effort to further the
relationship between that firm and Toyota. These materials included memos on my
responsibilities and duties at TMS, my expectations of their duties and
responsibilities, the "Toyota Way" principles, and specific definitions to understand
our relationship. I visited Nelson Mullins to personally make the same presentation
to its attorneys working on Toyota cases. I also prepared a presentation for the
Outside Counsel Seminar in August 2006 (that I was unable to attend due to the
Barahona trial) on Leveraging Case Resolutions Strategies through a Credible Trial
Threat to contribute to the seminar."

## B.    Integrating & Developing E-Discovery Processes.

The second comment above is unjustified. I have repeatedly attempted to incorporate E-
Discovery processes and procedures into "traditional case management team discovery
handling procedures." Eric Taira and TMC have taken aggressive steps to prevent me
from achieving this goal. When I wanted to conduct interviews of TEMA personnel
related to the "Books of Knowledge" and TRIM, Eric Taira and TMC got together to
prohibit me from doing so by (a) reneging on the agreement to proceed with the
interviews, (b) by setting up superficial "requirements" before conducting the interviews
(getting Shibata-san's agreement, and then getting TEMA & TMC to agree in person --
again), (c) disregarding formal requests for assistance from Dan Fuchs of TEMA, and (d)
by requiring Dan Fuchs, or Diane Williamson, to conduct the interviews so they can
become "more worldly about PL litigation." Additionally, TMC refuses to authorize the
production of Green ESI that is clearly discoverable in rollover litigation, and this
position is in violation of TMC's legal obligations. Eric Taira refuses to support me in
my efforts to get TMC to agree that the Green ESI must be produced. I have repeatedly
requested, and it has been denied, for ESI from TMC to prepare cases for trial and to
produce ESI in discovery as TMC is legally obligated to do so.

## VI.    Critical Success Factors.

"Mr. Biller is encouraged to enroll in management courses offered by the University of Toyota, including the Management Foundations and Toyota Traditions courses."

I have already taken the Toyota Traditions course offered by the University of Toyota. I already informed Eric Taira in February 2006 that I was going to take additional management courses.

## VI.   Eric Taira's Retaliation against Dimitrios P. Biller

### 1.   Disagreements about the handling of E-Discovery.

I have been very upfront and honest with Eric Taira about E-Discovery issues. There is no secret Eric Taira and I strongly disagree on how to resolve these issues. Some people would say that I have been "critical" of Eric Taira's management of these issues. The above Sections I through V illustrate the level of disagreement.

### 2.   Dysfunctional Work Environment that is Demoralizing

Furthermore, I have been upfront and honest about the dysfunctional work environment in the PL Group. As the Group Leader, Eric Taira is responsible for creating a more positive and healthy work environment. I informed Eric Taira about the dysfunctional work environment last year in my Self Assessment. I stated:

## "B.   My Efforts are being Undermined in The Rollover Program.

In an effort to make others feel they have ownership over the Rollover Program (a valid concern that should not be promoted to the exclusion of other equaling important and bigger goals), certain decisions have been made that were potentially and actually inconsistent with the interests of Toyota. In the process, my views have been ignored, minimized and subjected to disrespect in such a way that I was made to look invaluable and feel horrible. Only a couple examples are needed to substantiate this point.

The first example involves Chris Spencer. Doug Bishop's desire to include Chris Spencer as a "regular" member of the National Rollover Program and the decision to include Chris Spencer as a "regular" member was simply the wrong decision. However, the manner in which that decision was made is indicative of how my efforts are being undermined. I gave very specific, reasonable and logical reasons to not include Chris Spencer in the program (Chris was not a team player, Chris managed to insult his clients/partners/colleagues/peers with his arrogance so the meetings would not be productive, Chris did not openly share information, and Chris turned Toyota down on numerous occasions when Toyota needed his services). However, Doug Bishop's reasons were not, in my opinion, reasonable (he liked working with his, Chris was handling approximately 6 rollover cases for Doug Bishop, Chris has a lot of general rollover information and Chris Spencer was working on the VSC project). Doug's reasons would justify regularly inviting Joel Dewey and Joel Smith to the meetings. The

main reason, perhaps the real reason, that Chris Spencer was initially invited to be a "regular" participate in the Rollover Program was to keep a close relationship with Don Tandy, but this reason was never expressed before the decision was made and, in my opinion, is the wrong reason. We simply can not maintain real and meaningful relationships with people through relationships with third parties. I distinctly remember the horrible emotions I felt when the decision was announce because I was not even asked at that meeting how I felt; instead, the decision was simply made without addressing my concerns, after asking Doug Bishop/Luke Torres about their feelings and ignoring me. Unfortunately, Chris Spencer proved to be irresponsible when he bailed out of the Atchar trial, failed to inform TMS about his conflict in a timely manner, abandoned the VSC project, managed to insult me and Kurt Kern in the July 19, 2005 Rollover Meeting because of Don Tandy's performance, and failed to inform me and others (his partners) about the NHTSA Phase I testing discovered during the Powell deposition preparation of Yonekawa. All the reasons used to justify the initial decision still exist, but he is now (thankfully) not part of the program because Chris Spencer repeated all of the concerns I expressed to substantiate my position.

Another example relates to the Tundra testing. The decision to allow Don Tandy to conduct the V-8 Tundra testing was inconsistent with prior understandings, and gave difference to others who did not follow accepted protocols. More importantly, nobody ever addressed the valid reasons I believed and continue to believe to justify that Lee Carr should do that testing. Instead, those reasons were ignored to make others feel like they have ownership of the program and/or to give Don Tandy some more "love" (although Don continues to disappoint Toyota by (a) failing to complete special projects in a proper and timely manner – utility demonstration that took 6 months to complete –, (b) failing to properly prepare for trial, (c) incomplete/inaccurate accident reconstructions, and (d) misleading statements regarding the reasons for his lack of preparation). Furthermore, when I specifically asked Doug Bishop to answer my questions about Don Tandy conducting the Tundra testing, Doug stated he did not have to answer my questions and nobody instructed him that he was obligated to answer questions by co-Managing Counsel. Don Tandy's performance on that testing was less than perfect and was unnecessarily delayed. When Doug and I exchanged our views on this issue, I warned something might go wrong.

I have been mistreated during meetings and subject to disrespect and embarrassment. On many occasions during meetings with other Managing Counsel my opinions and views were not asked for or were prematurely dismissed without adequate consideration. Instead, the views of the other Managing Counsel were sought, presumably because those views were consistent with the direction that wanted to be pursued. For example, during the second meeting on whether Chris Spencer should be included as a regular participate in the Rollover Program, I was not even asked on how I felt; instead, other Managing Counsel were asked how they felt (they both recommended that Chris Spencer be invited). During the meeting on cutting down the list of invitees to the National Rollover meetings, when I voiced my disagreement about inviting Jim Halbrooks, my view was almost immediately dismissed until I asked "don't you want to hear the reasons for my position." When I gave those reasons, it was like talking to a wall. However, when other Managing

Counsel supported my views, a compromised position was accepted (invite Jim Halbrooks for morale and Bard Borkon because he deserves it/we need him). These two incidents show that I have been treated with disrespect; it appears to me that I have been singled out as someone who does not have anything important to say. This treatment is demoralizing, embarrassing, and wrong. History has shown my positions are well reasoned and were the correct path to follow.

The most amazing part of this serious concern is that there appears to be more concern about outside counsel who have committed ethical violations, and attempted to improperly use my name to promote their own interests adversely to the interests of Toyota. In other words, there is more effort to protect outside counsel who have a longer relationship with Toyota than there is devoted to protecting a in-house representative of TMS. This type of management is disruptive, destructive, and damaging to a positive work environment because it is demoralizing.

It is my recommendation that we stop making decisions based on the unreasonable "sensitivities" of people (because of their insecurities and defensiveness) and we need to take decisive action based on the reasonable, logical, concrete and valid reasons that support the right decision.

## C. Lack of Direct and Coordinated Communication.

The above situations involving Jim Halbrooks, Tundra testing and Chris Spencer are also good examples of a lack of direct and coordinated communication that has cost Toyota time and money through confusion, mistakes and creation of distrusting environment. I have previously voiced my serious concerns about a failure to communicate directly, to coordinate communication and to share information among all Managing Counsel on rollover cases. The Tundra testing experience above and the Evans settlement at trial below are perfect examples of poor communication that is undermining "group" goals (managing 4Runner/rollover litigation in a coordinated manner and promoting a "credible trial threat.")

Additionally, on two occasions I was essentially told how to handle/resolve cases in front of a group of outside counsel without being consulted. This approach to supervising me on how to handle cases, in my opinion, is not appropriate. It was strongly suggested at the May 2005 Quarterly Meeting that I resolve the Hunsberger/Butterfield cases to avoid E-Discovery issues without being consulted on how to deal with that issue before the meeting. It was announced at the July 19, 2005 Quarterly Meeting that the Sears case should be settled to avoid some sensitive issues on E-discovery. I was never consulted before this announcement. If I am Managing Counsel on cases, then I should be consulted on how cases should be resolved. Even if settlement of these cases was the appropriate action, the manner in which that course of action was initiated was simply wrong because it showed a lack of confidence and was "micro-management" that is inconsistent with the type of management TMS has historical pursued. Micro-management results in a demoralizing environment.

21

Something has happened to cause this recent micro-management. For example, when Toyota had to make a decision on whether to take Naranjo to trial in July/August 2003, I was approached in private to get my views on how that case should be handled. Although there was a disagreement on how to resolve that case (trial vs. settlement), there was a healthy debate and discussion in private before the Quarterly Meeting. Those views were then announced at the Quarterly Meeting for further debate. The handling of the Naranjo situation is completely different from how management decisions were unilaterally imposed on me without any private discussion on Hunsberger, Butterfield and Sears during 2005. Despite the fact that I have shown outstanding abilities in identifying viable trial candidates, making sure those trial candidates matured into defense verdicts, and settled dozens of cases for figures far less than recommended by outside counsel in the last 2 ½ years, while managing global and "big picture" issues, I have been subject to micro-management of cases without being shown proper difference and/or respect when there was an interest to get Hunsberger, Butterfield and Sears settled. If I have done something wrong, I should know mistakes have led to this situation.

It is my recommendation that all Managing Counsel and our group should be encouraged (instructed) to exchange information, answer questions and mutually share views. Coordinated and full communication in today's world can easily be accomplished via e-mail."

### 3.    Inadequate Compensation.

I have repeatedly told Eric Taira that I do not want to receive a "lump sum" bonus as a salary increase, and I need to receive my salary increase via a percentage increase. For example, this year my merit increase was 1%, but I also received a lump sum bonus that was 4.49% of my salary. Although I have tremendously grateful for the bonus, it adversely affects my salary over time. I informed Eric Taira last year of the following:

**"C.  My Position and Career.**

I understand that TMS recognized my significant contributions last year when TMS adjusted my financial package and allowed me to take two additional weeks off. I am very thankful and grateful to TMS for these gestures and commitment. It was very important for me to receive this commitment because I felt I made tremendous financial and human sacrifices resigning from Pillsbury Winthrop to take my current position and I would not have made that change if I fully understood the severe mismanagement of the National Rollover Program that pre-dated my arrival and that led to the deterioration of the program that I had to clean up. I have some concerns about any fall out relating to the adjustment in my financial package. First, and foremost, I'm concerned that I will be resented for requesting a readjustment. Nobody knows about my financial package other than my supervisors and my family. Second, I'm concerned that there will be the misperception that I'm unhappy about my current position. I am very happy and satisfied with my current situation and do not have any resentment about being "Managing Counsel" at TMS. Third, I'm concerned that I will not receive the maximum annual raises and bonuses I should receive based on my performance because there may be the



Case 2:09-cv-00292-TJW    Document 1-3    Filed 09/25/2009    Page 24 of 36
Case 2:09-cv-05429-GHK-RZ    Document 1    Filed 07/24/2009    Page 99 of 117    P 23/23

misperception that last year's adjustment compensated me for my hard work and excellent results. Again, I view last years financial adjustment to correct a historical mistake related to my initial signing bonus and initial starting annual salary in 2003, not a reward for the achievements of last year. Although I confirmed this understanding with Dian Ogilvie and Eric Taira, I am anxious about this year's assessment and annual increase/bonus because it will be the first time I will be assessed following last year's adjustment. Fourth, I want to end my legal career with TMS and continue to progress within the Legal Department, but I'm concerned that my opportunities will be limited. Fifth, I believe I should receive the maximum annual raise and bonus in the department because the time commitment I made last year, the number of hours I worked, the time I spent away from home, the results I obtained, and the magnitude of the money I save Toyota are simply unprecedented."

Eric Taira did not communicate my concerns and request to the Leadership Committee when merit increases were being discussed.

_____        _____        _____
Dimitrios P. Biller          Eric Taira                    Dated

23                                                                                99

# EXHIBIT "2"

Case 2:09-cv-00292-FJW-08 Document 1-3 Filed 09/25/2009 Page 26 of 36
TOYOTA LEGAL
Case 2:09-cv-05429-GHK-RZ Document 1 Filed 07/24/2009 Page 101 of 117 ☒002/015

# CONFIDENTIAL SEVERANCE AGREEMENT AND GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS

This CONFIDENTIAL SEVERANCE AGREEMENT AND GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS ("Agreement") is entered into by and between Toyota Motor Sales, U.S.A., Inc. ("TMS" or "Employer") and Dimitrios P. Biller ("Associate"), (collectively, the "Parties"). As used in this Agreement, the terms "Affiliate" or "TMS-affiliated company" refers to any person or entity that directly or indirectly controls, is controlled by, or is under common control with TMS.

## RECITALS

WHEREAS, Associate's employment will end in any capacity with TMS (or any TMS-affiliated company) on September 17, 2007 ("Separation Date");

WHEREAS, if Associate accepts and signs this Agreement, and does not revoke such acceptance within seven calendar days after signing this Agreement, then this Agreement will become effective on the eighth day after Associate has signed and returned this Agreement to legal counsel for TMS ("Effective Date");

WHEREAS, TMS and Associate desire to resolve any and all potential claims that may exist between them in accordance with the terms and conditions set forth in this Agreement;

NOW THEREFORE, in view of the foregoing and in consideration of the mutual covenants and promises contained herein, Associate and TMS agree as follows:

## AGREEMENT

1. Final Wages and Vacation

   TMS will pay Associate for all earned but unpaid wages and all accrued but unused vacation through the Separation Date. Payment of these sums will be subject to applicable deductions and withholdings as required or permitted by law. Associate will receive these sums whether or not Associate signs this Agreement. Associate acknowledges that Associate has submitted and been reimbursed for all business expenses.

2. Consideration

   Associate acknowledges that the consideration outlined below constitutes good and valuable consideration to which Associate is not otherwise entitled by reason of Associate's employment with TMS.

   2.1. <u>Severance Payment - Wages</u>. Within seven (7) calendar days following Separation Date or re-execution of this Agreement on or after Separation Date as provided herein,

Initials: _____ / Biller    _____ / TMS

#2907809 I 013186.1090

1

CONFIDENTIAL

Case 2:09-cv-05202-FVW   Document 1-3   Filed 09/25/2009   Page 27 of 36
TOYOTA LEGAL
Case 2:09-cv-05429-GHK-RZ   Document 1   Filed 07/24/2009   Page 102 of 117   ☑003/015

whichever is later, TMS will mail to Associate's Notice Address provided in Paragraph 8 (Notice) of this Agreement, a lump sum payment in the gross amount of Four Hundred Fifty-Five Thousand, Three Hundred and Twenty Dollars and No Cents ($455,320.00) ("Severance Payment - Wages"). This Severance Payment - Wages is subject to deductions and withholdings as required or permitted by law. This Severance Payment - Wages will be reported as gross wages on Associate's W-2 form for the calendar year in which it is paid.

No 401k deduction can be made from this Severance Payment - Wages because such a payment is not included in the 401K Plan's definition of "Base Pay Compensation." Accordingly, no 401k match payment will be made. Similarly, this cash-out payment is not taken into account under any other TMS/TMS-affiliated company plan.

2.2. <u>Severance Payment – Non-wages</u>. TMS agrees to pay Associate a lump sum payment in the gross amount of Two Million, Two Hundred Ninety-Four Thousand, Six Hundred and Eighty Dollars and No Cents ($2,294,680.00) for alleged emotional distress damages ("Severance Payment – Non-wages"). The Severance Payment – Non-wages will be reported as a non-wage payment in Box 1 of Associate's W-2 and will not be subject to payroll taxes or federal, state and local income tax withholdings at the time of payment. TMS will mail the Severance Payment – Non-wages to Associate's Notice Address provided in Paragraph 8 (Notice) of this Agreement within seven (7) calendar days following Separation Date or re-execution of this Agreement on or after Separation Date as provided herein, whichever is later.

No 401k deduction can be made from this Severance Payment because such a payment is not included in the 401K Plan's definition of "Base Pay Compensation." Accordingly, no 401k match payment will be made. Similarly, this cash-out payment is not taken into account under any other TMS/TMS-affiliated company plan.

2.3. <u>Attorney's Fees</u>. TMS agrees to pay Associate's attorney's fees in the amount of Nine Hundred, Fifty Thousand Dollars and No Cents ($950,000.00) ("Attorney's Fees Payment"). TMS will mail the Attorney's Fees Payment to Michael J. Faber within seven (7) calendar days following Separation Date or re-execution of this Agreement on, or the receipt of a W-9 form properly completed on behalf of Michael J. Faber, whichever is later. TMS will issue to Michael J. Faber a Form 1099 consistent with applicable law.

2.4. <u>Forgiveness of Loan</u>. As consideration for the re-execution of this Agreement on or after Separation Date as provided in Paragraph 3 (Waiver and Complete Release), TMS agrees that the April 22, 2005 Loan Agreement between Associate and TMS is hereby modified to delete the requirement of continued employment and the loans stated therein will be forgiven and reported to tax authorities for tax purposes as compensation according to the schedule stated therein.

Initials

Biler

TMS

CONFIDENTIAL

2.5. <u>Tax Consequences</u>. TMS makes no representations or warranties with respect to the tax consequences of the payment of any sums under the terms of this Agreement. Associate agrees and understands that he is responsible for payment, if any, of local, state and/or federal taxes on the sums paid hereunder by TMS and any penalties or assessments thereon. Associate further agrees to indemnify and hold TMS harmless from any claims, demands, deficiencies, penalties, assessments, executions, judgments, or recoveries by any government agency against TMS for any amounts claimed due on account of: (a) Associate's failure to pay federal or state taxes, any allegation that TMS failed to withhold, or Associate's delayed payment of federal or state taxes; or (b) damages sustained by TMS by reason of any such claims, including attorneys' fees and costs.

3. Waiver and Complete Release

<u>General Release - Associate</u>. In consideration of the mutual promises herein and by TMS in Paragraph 2 (Consideration) of this Agreement, on behalf of Associate and Associate's dependents, descendants, heirs, executors, administrators, assigns and successors, Associate hereby knowingly and willingly, wholly and forever releases and discharges TMS and/or its parents (Toyota Motor North America Inc. and its parent Toyota Motor Corporation), and each of them and/or its or their present and past subsidiaries, divisions, business units, related corporations, affiliated entities, shareholders, board members, officers, directors, co-venturers, partners, insurers, employees ("associates"), consultants, contingent workers, independent contractors, agents, attorneys, employee benefit programs (and the trustees, administrators, fiduciaries and insurers of such programs), predecessors, successors, purchasers, assigns and representatives (collectively, "TMS Releasees"), from any and all legally waivable charges, grievances, claims, promises, wages, demands, debts, actions or causes of action, obligations, damages and liabilities of whatever kind or nature, whether known or unknown, suspected or unsuspected, which arise out of or are in any way connected with: (1) Associate's employment relationship with TMS; (2) Associate's hiring by TMS; (3) Associate's participation in employee benefit programs; or (4) Associate's separation from TMS; and any claim which Associate now has, has had, or may have in, in any way arising from or relating to any act, omission, occurrence or transaction occurring up to and including the date this Agreement is signed ("Released Claims"). This is a General Release. Associate shall on or after Separation Date, and for the Consideration given herein in paragraph 2.4 (Forgiveness of Loans) of this Agreement, re-execute this Agreement so as to cause, and intend, that this General Release shall be effective as of Separation Date or the date of re-execution by Associate, whichever is later.

<u>General Release - TMS</u>. In consideration of the mutual promises herein, TMS hereby knowingly and willingly, wholly and forever releases and discharges Associate, attorneys, heirs and representatives (collectively, "Associate Releasees"), from any and all legally waivable charges, grievances, claims, promises, wages, demands, debts, actions or causes of action, obligations, damages and liabilities of whatever kind or nature, whether known or unknown, suspected or unsuspected, which arise out of or are

Initials: _____  _____
Biller        TMS

82907809.1 013186.1090

3

CONFIDENTIAL

in any way connected with: (1) Associate's employment relationship with TMS or (2) Associate's separation from TMS; and any claim which Associate now has, has had, or may have, in any way arising from or relating to any act, omission, occurrence or transaction occurring up to and including the date this Agreement is signed ("Released Claims"). This is a General Release.

3.1. <u>Waiver of Age Discrimination in Employment Act of 1967.</u> Associate also expressly acknowledges and agrees that:

(1) Associate has carefully read and fully understands all of the provisions of this Agreement and understands that through this Agreement, Associate is releasing TMS and the other TMS Releasees from any and all claims Associate may have against them;

(2) Associate is waiving any and all rights, charges or claims that Associate may have arising under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et. seq., as amended by the Older Workers Benefit Protection Act ("ADEA"), which have arisen on or before the date this Agreement is signed;

(3) Associate is not waiving any rights or claims that may arise after the date that this Agreement is signed;

(4) This waiver and release is knowing and voluntary and the consideration given for this waiver and release is in addition to anything of value to which Associate was already entitled as a TMS Associate;

(5) Associate was advised and is hereby advised in writing to consult with an attorney of Associate's choice prior to signing this Agreement;

(6) Associate has the opportunity of a full twenty-one (21) calendar days within which to consider this Agreement before signing it, and that if Associate does not take that full time period, Associate does so knowingly and voluntarily, and further agrees Associate will not assert the invalidity of this Agreement or any portion thereof on this basis;

(7) Associate has a full seven (7) calendar days after signing this Agreement to revoke this Agreement ("Revocation Period"), and has been and is hereby advised in writing that this Agreement, all of its terms, and all of its obligations of the TMS Releasees contained herein, shall not become effective or enforceable until this Revocation Period has expired.   To revoke this Agreement, Associate must provide written notice of revocation to Matthew Gonzales at the Notice address in Paragraph 8 (Notice) no later than the end of the seventh day after the Associate signs this Agreement and TMS must actually

Initials: _____   _____
              Biller        TMS

82907509.1 013186.1090

4

CONFIDENTIAL

receive such written notice of revocation. The Revocation Period may not be waived. If Associate revokes this Agreement, Associate will not receive any consideration under Paragraph 2 (Consideration) of this Agreement and Associate's release of ADEA claims will not go into effect.

3.2. <u>Waiver of Unknown Claims</u>. It is a further condition of the consideration herein and it is the intention of the Parties in signing this Agreement that the Agreement shall be effective as a bar to the Released Claims in Paragraph 3 (Waiver and Complete Release) and, in furtherance of this intention, the Parties hereby expressly waive any and all rights or benefits conferred by the provisions of California Civil Code § 1542 and of any similar rule of law adopted by statute or otherwise in any jurisdiction of the United States including, but not limited to California, and expressly consent that this Agreement shall be given full force and effect according to each and all of its express terms and conditions, including those relating to unknown and unsuspected claims, demands and causes of action, if any, as well as those relating to other claims, demands and causes of action specified in Paragraph 3 (Waiver and Complete Release). Section 1542 of the California Civil Code provides:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his/her favor at the time of executing the release, which if known by him/her must have materially affected his/her settlement with the debtor."**

The Parties acknowledge that they may hereafter discover claims or facts in addition to or different from those which they now know or believe to exist with respect to the subject matter of this Agreement and, which, if known or suspected, at the time of signing this Agreement, may have materially affected this Agreement. Nonetheless, the Parties acknowledge that they understand the significance and consequence of such release and such specific waiver of SECTION 1542.

3.3. <u>Claims Not Released</u>. This Agreement does not release claims based on obligations created or reaffirmed by this Agreement; claims based on any vested pension rights or any other claims which, by operation of law, cannot be waived, including, without limitation, any workers' compensation claims.

3.4. <u>Ownership of Claims</u>. The Parties represent and warrant that they have not assigned or transferred any claims they are purporting to release nor have they attempted to do so.

4. <u>Associate's Obligations and Representations</u>

4.1. <u>Associate Acknowledgement of Consideration</u>. Associate acknowledges that the consideration set forth in Paragraph 2 (Consideration) above is the only consideration to which Associate is entitled under this Agreement. Associate agrees that the foregoing shall constitute an accord and satisfaction and a full and complete settlement of Associate's

Initials: _____  _____
              BH          TMS

CONFIDENTIAL

Case 2:09-cv-01292-TJS Document 1-3 Filed 09/25/2009 Page 31 of 36
TOYOTA LEGAL
Case 2:09-cv-05429-GHK-RZ Document 1 Filed 07/24/2009 Page 106 of 117 @007/015

claims, shall constitute the entire amount of monetary consideration provided to Associate under this Agreement except as provided herein, and that Associate will not seek any further compensation for any other claimed damage, costs or attorneys' fees in connection with the matters encompassed in this Agreement.

4.2. Disengagement

4.2.1. Associate specifically represents and warrants that Associate has no unreported work-related injuries. Associate represents and warrants that Associate has no workers' compensation claim to file that has not already been filed regarding Associate's employment with TMS.

4.2.2. Associate specifically represents and warrants that Associate currently has no pending claim for violation of the Fair Labor Standards Act or the Family and Medical Leave Act and has had no such claims in the past.

4.3. Confidentiality of Agreement. Associate represents and warrants that Associate has not disclosed (with the exception to Michael Faber, his spouse, his psychiatrist, and Mark Rudy) and shall not disclose the underlying facts that led up to the severance of employment evidenced by this Agreement, or the terms, amount or existence of this Agreement to anyone (including, but not limited to, any former or current associate of TMS or the news media), for any reason in any manner without the prior written consent of TMS. If asked about the underlying facts, terms, amount or existence of this Agreement, Associate may make only the following statement: "My employment at TMS ended and all issues were resolved." Notwithstanding the foregoing, Associate may disclose the terms of this Agreement to Associate's spouse and to Associate's legal, financial, or tax advisors. However, prior to any disclosure, Associate shall notify such third parties of the confidential nature of this Agreement and shall secure their commitment to maintain said confidentiality. A violation of this Agreement by such a person will be treated as a violation of this Agreement by Associate. Associate agrees that any disclosure by Associate (or by any permitted recipient) in violation of the foregoing shall constitute and be treated as a violation of this Agreement. As the damages TMS would suffer if this provision were violated would be difficult to calculate, Associate promises to pay TMS Two Hundred Fifty Thousand and No Cents ($250,000.00) for each violation. This paragraph does not prohibit disclosures to the extent necessary to legally enforce this Agreement or to the extent required by law, nor does it prohibit disclosures to the extent otherwise legally required, including reporting all payments made pursuant to this Agreement to the Internal Revenue Service and other local, state and federal taxing authorities. If disclosure of this Agreement or its terms is, or is asserted to be, required by law, whether through subpoena, request for production, deposition, or otherwise, Associate shall provide written notice to TMS at least thirty calendar days prior to the disclosure. If such notice is not possible, Associate shall provide written notice to TMS as soon as practicable under the circumstances, so as to provide TMS a sufficient opportunity to oppose the disclosure.

Initials: _____  _____
         Bill     TMS

4.4. <u>Payment of Taxes and Indemnification of TMS</u>. Associate acknowledges that Associate has not received and has not relied upon any purported tax advice from TMS or other Releasees. Associate acknowledges and agrees that Associate, and not TMS, will be solely responsible for all tax obligations, if any, arising from the payment of consideration specified in Paragraph 2 (Consideration) and its subparts. Associate agrees to promptly pay and to defend (including paying for all the costs of defense) indemnify, hold harmless TMS and other Releasees for any taxes, penalties, interest found due and owing as a result of any consideration paid under this Agreement.

4.5. <u>Non-Disclosure of Confidential and Legally Privileged Information</u>. Associate acknowledges that, by reason of Associate's position as an attorney with TMS in its Legal Department, Associate has been given access to confidential materials or information regarding TMS and TMS Releasees and/or the business affairs of TMS and TMS Releasees.

    4.5.1. For purposes of this Agreement, "Confidential Information" includes, without limitation, all information given or otherwise transmitted to Associate by TMS or TMS Releasees in the course of Associate's legal representation of TMS or TMS Releasees, all information classified as confidential or protected by TMS, information furnished to Associate by TMS or TMS Releasees or otherwise obtained by Associate, transmitted in writing, orally, visually (i.e. video terminal display) or on magnetic media, including all financial and credit information, product plans and technologies, all types of trade secrets (as defined by the Uniform Trade Secret Act), know-how, ideas, concepts, inventions, designs, drawings, sketches, flow charts, blue prints, diagrams, manufacturing and test data, engineering knowledge, computer programs, progress reports, methods research, procurement procedures, marketing and sales activities and procedures, pricing, distribution, personnel data, payroll data, employee benefits, employment policies, privileged communications, attorney-client communications, attorney work product, litigation and case handling or strategies, vendor data, contracts and any other confidential or proprietary information relating to TMS or TMS Releasees.

    4.5.2. Associate agrees that on or before Separation Date, Associate shall return to TMS any Confidential Information or related materials, including, without limitation, electronic data maintained on personal computers, laptops, PDAs (i.e. Blackberry or similar devices), CDs, DVDs, computer disks. In addition, Associate shall permanently delete and destroy any Confidential Information or related materials that Associate currently maintains electronically in any form, and shall not copy such Confidential Information or materials in any form or manner.

    4.5.3. Associate agrees to continue to abide by the terms of any Non-Disclosure agreements signed at the commencement of or during employment or any other non-disclosure obligations incurred during Associate's employment.

    4.5.4. Unless specifically authorized in writing by TMS, Associate shall not disclose or use any Confidential Information. Associate represents that Associate has held such information confidential and will continue to do so, and that Associate will not use

Initials: _____   _____
    Biller       TMS

such information and relationship for any purpose without the prior written consent of TMS.

4.5.5. Associate expressly represents and warrants that Associate has not disclosed Confidential Information to any other third party. To the extent Associate cannot so represent and warrant, and has disclosed Confidential Information to Associate's spouse, Associate's legal counsel or any other third party, on or before Separation Date, Associate shall identify such persons or third parties to TMS by name and address, with an identification with specificity of the Confidential Information disclosed to such persons or third parties. In the case that the disclosed Confidential Information is in documentary or other physical form, Associate shall obtain the return of such to TMS, and if in or electronic form, Associate shall secure the destruction of such to the satisfaction of TMS. Associate shall notify such persons or third parties of the confidential nature of such Confidential Information and shall secure their commitment to maintain the confidentiality of such.

4.5.6. This paragraph does not prohibit disclosures to the extent required by law. If disclosure of such Confidential Information is, or is asserted to be, required by law, whether through subpoena, request for production, deposition, or otherwise, Associate shall provide written notice to TMS at least thirty calendar days prior to the disclosure. If such notice is not possible, Associate shall provide written notice to TMS as soon as practicable under the circumstances, so as to provide TMS a sufficient opportunity to oppose the disclosure. Associate shall not, directly or indirectly, solicit such legal action attempting to compel disclosure of Confidential Information.

4.5.7. Associate agrees that any violation of the foregoing provisions of this paragraph and/or its sub-paragraphs, including each disclosure by Associate or any person or third party to whom Associate has disclosed Confidential Information of Confidential Information to and/or received by an unauthorized person or third party in violation of the foregoing provisions of this paragraph and/or its sub-paragraphs, shall constitute and be treated as a separate violation of this Agreement. As the damages TMS would suffer if this provision were violated would be difficult to calculate, Associate promises to pay TMS Two Hundred Fifty Thousand and No Cents ($250,000.00) for each violation.

4.5.8. Associate agrees that Associate's entitlement to consideration in Paragraph 2 (Consideration) is expressly conditioned upon Associate's full compliance with the terms of this paragraph.

4.6. Agreement Not to Facilitate Legal Action against Releasees. Associate agrees that Associate will not voluntarily discuss, communicate about in any manner, consult with, advise, counsel or otherwise encourage, cooperate with or assist any associates or former associates of TMS or any third parties, including any counsel adverse to TMS or any TMS Releasee, or represent any associates or former associates of TMS or any third parties, in the pursuit of any legal or administrative action(s) against TMS or TMS Releasees unless compelled to do so by valid legal process or requested to do so by TMS.

Initials: _____   _____
          Butey     TMS

4.8. <u>Nondisparagement</u>. Associate agrees not to disparage TMS or any other TMS Releasee, or their officers, associates, agents, products, brands, services or litigation and case handling or strategies and to act in good faith toward TMS and TMS Releasees.

4.9. <u>Return of Property</u>. Associate agrees that on or before the Separation Date, Associate will return to TMS all equipment and other tangible property of TMS or TMS Releasees in his possession and/or the possession of any third party to whom Associate has transferred possession, including, without limitation, identification cards, keys, cell phones, personal digital assistants (PDAs), computers, credit cards, Confidential Information and related materials, documents, books, records, reports, contracts, lists, software, computer disks, other computer-generated files or data, and any copies thereof, created on any medium, prepared or obtained by Associate in the course of or incident to employment with TMS. Associate will also permanently delete and destroy any Confidential Information or related materials that was created or obtained during the course of or incident to employment with TMS that Associate currently maintains electronically in any form on any personal property, including, without limitation, computers, laptops, PDAs, CDs, DVDs, computer disks. As to any vehicle(s) that Associate has leased under TMS' Vehicle Lease Program, Associate shall return the vehicle(s) in good condition and pursuant to the current terms of TMS' Associate Vehicle Lease program no later than Separation Date.

Initials: _____  _____
         Butler            TMS

4.10.    **No Future Employment.** Associate understands that Associate's employment with TMS and all related or affiliated companies will terminate forever on the Separation Date. Associate agrees that Associate will not seek, apply for, be eligible for, accept or maintain employment or re-employment with TMS, TMS-affiliated companies or TMS-affiliated dealers as an associate, employee, contingent worker, consultant, temporary employee, independent contractor or in any capacity whatsoever. Associate agrees that TMS, TMS-affiliated companies, TMS-affiliated dealers shall not at any time be under any obligation to employ Associate as an associate, employee, contingent worker, consultant, temporary employee, independent contractor or in any capacity whatsoever. Associate further agrees that this Agreement shall constitute good cause for TMS, any TMS-affiliated company, and any TMS-affiliated dealer not to hire, rehire or retain him as an associate, employee, contingent worker, consultant, temporary employee, independent contractor or in any capacity whatsoever.

4.11.    **No Return to Property.** Associate agrees that, as of the Separation Date, Associate will not return to TMS Releasees' property or attend a TMS Releasee event for any reason without the express prior written consent of Matthew Gonzales or his successor and Associate acknowledges the right of TMS Releasees to remove Associate from the property if Associate violates this sub-paragraph.

4.12.    **Non-Solicitation of Associates.** Associate agrees not to solicit, directly or indirectly, any Associate or employee of TMS or any TMS Releasee to leave the employment of TMS or any TMS Releasee.

4.13.    **Assignment; Successors and Assigns.** The Parties represent that they have not and will not assign, sell, transfer, delegate or otherwise dispose of, whether voluntarily or involuntarily, or by operation of law, any rights or obligations under this Agreement, without the express written agreement of the other party. Any such purported assignment, transfer or delegation is null and void. The Parties represent that they have not previously assigned or transferred any claims or rights released by them pursuant to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, successors and permitted assigns.

5.    **No Admission of Liability.** The Parties understand and agree that this Agreement and the furnishing of the consideration for this Agreement shall not be deemed or construed at any time or for any purpose as an admission of liability for any and all existing or potential claims.

6.    **Dispute Resolution – Final and Binding Arbitration as Exclusive Remedy.**

6.1.    **Agreement to Arbitrate.** The Parties agree that the resolution of certain disputes shall be conducted exclusively through binding arbitration as set forth herein. The disputes for which arbitration is the exclusive remedy, include, but are not limited to: (1) all known

Initials: _____    _____
           Bitler        TMS

and unknown claims which Associate may have against TMS or any other Releasee which arose at or prior to the date this Agreement is signed and is not extinguished by this Agreement, if any; (2) all known and unknown claims Associate may have against TMS or any other Releasee that in any way relate to the subject matter, interpretation, application, or alleged breach of this Agreement arising at any time prior to, concurrently with or subsequent to Associate's signing this Agreement; and (3) any known or unknown claims that Associate may have against TMS or any other Releasee which arise at any time after Associate signs this Agreement as well as the arbitrability of any dispute (collectively, "Arbitrable Claims"). This agreement to arbitrate does not preclude either party from seeking injunctive relief in court.

6.2. <u>Arbitration Rules and Procedures</u>. The arbitration shall be held in accordance with the rules and regulations of Judicial Arbitration and Mediation Services (JAMS) pertaining to employment disputes. Prior to submitting any dispute to JAMS for final and binding arbitration, the Parties agree to meet and confer in good faith and to submit to an external mediation in an effort to resolve the dispute. If the dispute is not resolved in informal discussions or at mediation, the arbitration shall be final and binding upon the Parties and shall be the exclusive remedy for all Arbitrable Claims. The Arbitrator is required to follow applicable law and case precedent of the jurisdiction where the Associate last worked for TMS and will have full authority to award any relief available to be awarded had the dispute been brought in any other forum such as a federal or state court. The Arbitrator will issue with his/her award a written decision sufficient to permit limited judicial review to enforce or vacate the arbitration award. The Parties will pay their own costs and attorneys' fees associated with the arbitration. Each party will pay their pro rata share of JAMS fees and expenses. Either Party may bring an action in court of competent jurisdiction to compel arbitration under this Agreement or to enforce or vacate an arbitration award. Otherwise, neither Associate nor TMS nor any other Releasee shall initiate or prosecute any lawsuit, administrative action or any other type of dispute proceeding in any forum in any way related to an Arbitrable Claim. Any arbitration held under this Agreement shall be conducted in Los Angles County, California, unless another location is mutually agreed to by the Parties.

6.3. THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO AN ARBITRABLE CLAIM, INCLUDING WITHOUT LIMITATION, ANY RIGHT TO TRIAL BY JURY AS TO THE MAKING, EXISTENCE, VALIDITY, OR ENFORCEABILITY OF THIS ARBITRATION PROVISION.

6.4. <u>Bargained For Provision</u>. The Parties represent and warrant that the arbitration provisions in this Agreement are specifically negotiated for provisions, including (without limitation) the provisions pertaining to the types of claims to be included or excluded from the definition of Arbitrable Claims and the selection of rules to govern the arbitration. The Parties represent and warrant that these provisions have been bargained for in order to provide for a cost effective and efficient means of resolving

Initials:

Biller

TMS